Filed 10/17/23  In re Sky W. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re SKY W. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>D.S.,<br><br>    Defendant and Appellant. | F085709<br><br>(Super. Ct. Nos. JD143833-00 & JD143834-00)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Susan M. Gill, Judge.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Elizabeth M. Giesick, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

In this juvenile dependency case, then-four-year-old Sky W. and one-year-old Desiree W. were taken into temporary custody by the Kern County Department of Human Services (Department) after law enforcement executed a search warrant for a rural property containing a large marijuana grow. D.S. (Mother), who was pregnant at the time, and Jonathan W. (Father), were arrested after they attempted to flee in a vehicle with their two children. Relevant to this appeal, the juvenile court subsequently sustained three counts under Welfare and Institutions Code,[1] section 300, subdivision (b), declared the children dependents of the court, removed the children from their parents' physical custody under section 361, subdivision (c)(1), and ordered reunification services for both parents.

Mother timely appealed from the jurisdictional and dispositional orders, and she advances three claims.[2] First, she argues the juvenile court's finding against her on count b-2, substance abuse based on her use of marijuana during pregnancy to treat hyperemesis gravidarum, is not supported by substantial evidence that she abused marijuana or that her marijuana use placed the children at substantial risk of serious harm. Second, Mother argues the juvenile court erred in finding, by clear and convincing evidence, that there would be a substantial danger to the children if returned to her physical custody. Third, she argues the case plan orders pertaining to substance abuse and mental health were erroneous, as there is no evidence that she is a substance abuser or has mental health issues. In support of her claims, Mother requests we take judicial notice of selected portions of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-V-TR pertaining to substance-related

---

[1]   All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]   Father is not a party to the appeal.

2.

disorders, and DSM-III, pertaining to substance use disorders), and legislative materials pertaining to the Senate Bill No. 1195 (1985–1986 Reg. Sess.) task force on child abuse reporting laws. (Evid. Code, §§ 451, 452.)

The Department does not address Mother's claims on the merits. Instead, supported by copies of minute orders from a hearing held on June 20, 2023, the Department requests this appeal be dismissed as moot because the juvenile court granted Mother's section 388 petition and returned the children to her physical custody with family maintenance services. The Department also separately objects to Mother's request for judicial notice. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.)

In reply, Mother objects to the dismissal of her appeal on the grounds that the Department's request is procedurally deficient under the California Rules of Court, and that the Department mischaracterizes her appeal as challenging only the court's removal order. She argues against a finding of mootness and, if this court disagrees, requests we exercise our inherent discretion to reach the merits of her appeal.

Mother does not dispute the return of the children to her physical custody, notwithstanding her objection. However, we agree that this does not render her challenge to the count b-2 jurisdictional finding or the related dispositional orders moot, as this case remains ongoing and she remains subject to the dispositional orders challenged in this appeal, which relate, in part, to the count b-2 finding. (*In re D.P.* (2023) 14 Cal.5th 266, 276–277 (*D.P.*).) Further, we have the inherent discretion to reach the issues raised even if moot and we elect to do so. (*Id.* at pp. 283–287.)

As discussed below, we conclude count b-2 is unsupported by substantial evidence that Mother is a substance abuser or that her past use of marijuana to treat morning sickness presented a substantial risk of harm to the children. (§ 300, subd. (b)(1).) Given that Mother was no longer residing at the rural property or with Father at the time of the jurisdiction and disposition hearing, we also find that the court erred in finding there was clear and convincing evidence of a substantial danger to the children if returned to

3.

Mother's physical custody and no reasonable means by which to protect the children's physical health without removal. (§ 361, subd. (c)(1).) Finally, the court erred in ordering drug and alcohol testing, a second mental health assessment, and substance abuse and mental health services given the absence of *any* evidence that Mother had a substance abuse issue or mental health issues. Therefore, we reverse the juvenile court's jurisdictional finding on count b-2 pertaining to Mother's substance abuse; reverse the order removing the children from Mother's physical custody; and, as to Mother, reverse the dispositional orders related to substance abuse and mental health. The judgment is otherwise affirmed. In light of this disposition, it is unnecessary to reach the merits of Mother's request for judicial notice and it is denied.

## PROCEDURAL HISTORY

### I. Initial Removal and Detention

On the morning of September 7, 2022, law enforcement executed a search warrant for a rural property in Kern County containing a large marijuana grow.[3] Deputies found tubs of industrial pesticides outside, and nine pounds of marijuana, one ounce of cocaine, and exposed solar panel cables inside the house in the main bedroom. Deputies also located marijuana bongs. The house was dirty, and the children were dirty with stained clothing. However, there was food and water, and there were no signs the children were abused or neglected. Mother and Father fled the property in a vehicle with Sky and Desiree, but Mother subsequently pulled over and she and Father were arrested. The children were taken into custody by a deputy and turned over to a social worker.

The Department's detention report documents that a social worker interviewed Mother and Father while they were in custody following their arrests. Mother had no

---

[3] As described by a sheriff's deputy, the Kern County property was "in the middle of nowhere" and the dirt roads were unmarked. The property was described both by a street address and by GPS coordinates.

prior criminal history;[4] she denied any physical, emotional, or mental disabilities; and she denied any domestic violence, past or present. She also denied any alcohol or drug use, with the exception of marijuana edibles. She said she was diagnosed with hyperemesis gravidarum and used edibles to treat her nausea so she would not have to go the hospital. She denied smoking marijuana due to her asthma, and she said if tested for drugs, she would be positive for marijuana.

Mother reported she owned the property in question and had lived there for about two years, but she said the marijuana grow was located on a lot she rented for $1,000 a month to a tenant name J., who did not speak English. She said she had a written agreement at the house.[5] She denied knowing what the tenants were doing or communicating with them. She reported she was driving the family to a motel to keep the children safe, but pulled over when she realized law enforcement was behind her.

Father had a minor criminal history, and he reported domestic violence in a past relationship. He also reported he had untreated posttraumatic stress disorder from seeing a friend shot in the head by police. Father said that when helicopters started circling the property, it triggered his posttraumatic stress disorder and he felt like he could not breathe, so the family fled. He said the marijuana grow was located on a lot the family rented to someone, providing the family with income, and he acknowledged knowing the tenants were growing marijuana. Father denied any drug use other than marijuana approximately five times a day, which kept him calm, and he said he did not know how the cocaine came to be in the main bedroom. He said his friend S., who law enforcement

---

[4] The record does not reflect status on or disposition of the charges for which Mother was arrested on September 7, 2022, but she was present in person for the detention hearing held five days later; and at the jurisdiction hearing on January 23, 2023, her counsel represented he was not aware of any charges against her based on her flight from the property in a vehicle.

[5] During the execution of the warrant, law enforcement officers located three other adults on the property, two in the main house and one in a trailer. Officers found a written contract renting a one-acre parcel to J.G. for $1,000, and, inside the bedroom of a trailer where one of the three adults was staying, they located a receipt book with receipts to J. for $1,000.

reports reflect was one of the adults at the property when the warrant was executed, used cocaine and she might have put it in his room when police arrived. He stated that he had taken responsibility for the cocaine to law enforcement that day because he felt he had to, and he said that, on a doctor's order, Mother used marijuana edibles and sometimes smoked marijuana to treat her hyperemesis gravidarum, which left her bedridden.

Mother and Father had no prior dependency case history, but both had a history with child protective services as minors. In July 2018, Riverside County received a referral for general neglect involving allegations that Mother and Father were blowing marijuana in Sky's face; Father dunked Sky in a jacuzzi, causing her to cough; and the parents had a tug-of-war over Sky when arguing. The referral was deemed inconclusive after child protective services was unable to contact the family. There was also one referral from 2011 for general neglect against Father and paternal grandmother involving two children, which was deemed unfounded.

On September 9, 2022, the Department filed a detention report and a petition under section 300 alleging three counts under subdivision (b)(1) (failure to protect) and two counts under subdivision (g) (no provision for support). Count b-1 alleged Mother and Father failed to provide the children with adequate shelter based on the conditions of the property and house, count b-2 alleged substance abuse by Mother, and count b-3 alleged substance abuse and mental health issues by Father. Counts g-1 (Mother) and g-2 (Father) alleged Mother and Father were arrested and remained incarcerated. The petitions included Judicial Council Forms, form ICWA-010(A) stating that Mother is or may be eligible for membership in the Blackfoot tribe through her grandmother.

Mother was present for the detention hearing held on September 12, 2022, and continued to September 13, 2022. Father was in custody and was not present. Counsel for Mother and Father entered denials to the petition allegations and, after testimony by Mother, elevated Father's status from alleged father of Sky and Desiree to presumed father. The court found a prima facie showing had been made that Sky and Desiree were

persons described by section 300; ordered them detained from Mother and Father and placed in the temporary custody of the Department; and permitted Mother, who had been nursing Desiree, to provide breastmilk conditioned on a negative drug test.

The court set a combined jurisdiction and disposition hearing for October 28, 2022.

## II.     Mother's Ex Parte Request to Change Children's Placement

On September 28, 2022, Mother filed an ex parte request seeking to have the children moved from their current foster care home because Sky had a burn on her face and a black eye, Desiree had diaper rash, and both children appeared dirty. The court held a hearing on October 4, 2022, at which the social worker, through Department counsel, represented that the burn resulted from Sky placing her face close to a vaporizer the caregiver put in the bedroom after Mother requested a humidifier in the children's room, and the black eye was consistent with a reported fall Sky had in the first few days of the placement. The vaporizer had since been moved out of reach and the Department did not intend to change the children's current placement.

The hearing was continued to October 10, 2022, and the Department submitted a supplemental report. After Mother testified, the court concluded the caregiver was negligent in placing the vaporizer where Sky could reach it, but the situation had been addressed, and there was no indication the black eye was the result from anything other than a fall, consistent with Sky's own account. The court found no basis for removing the children and denied Mother's request.

## III.     Jurisdiction and Disposition

On October 28, 2022, after holding a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, the court granted Father's request and appointed new counsel to represent him. The court continued the jurisdiction and disposition hearing to January 23, 2023, to allow counsel time to prepare.

7.

At that time, Mother requested that the children be released to her. Her counsel represented that she was living at a different address with a friend and was seeking an inspection, she had completed four parenting classes and was going to substance abuse counseling twice a week, she was not using marijuana, and her drug tests were negative. Father's counsel joined in the request on behalf of Mother, but did not object to the children's continued detention from him.

Counsel for the Department and counsel for the children objected. Counsel for the Department stated that the Department had not yet seen a change in behavior or acceptance of responsibility for the conditions that led to removal. The court denied the request, stating, "I am glad Mother is engaging in counseling, but you need to understand what the problem was, and it doesn't sound like you yet understand what the problem was. So you can't fix something you don't believe is a problem. So based on that, I am not going to order release to the mother today."

On January 23, 2023, the court held a contested jurisdiction hearing. Mother and the friend with whom she had been living, T.W., testified. At the time of the hearing, Mother had recently relocated to her own two-bedroom apartment. The court sustained count b-1, sustained counts b-2 and b-3 as amended to remove the portion of the allegation that the children were not properly secured in the car, and found the children as described by section 300, subdivision (b)(1). The court dismissed the section 300, subdivision (g), allegations. Due to the unavailability of the children's counsel for further proceedings that day, the court set the disposition hearing for January 30, 2023.

At the disposition hearing, Mother requested the children be placed with her with family maintenance services. Her counsel represented that although Mother and Father were still in a relationship, he did not live with her, she had an apartment in California City, and she had "done pretty much a perfect case plan." Mother enrolled in classes and began taking steps to get the children back as soon as the dependency case began; she missed one parenting class, but completed all the others and only had one class

8.

remaining; and she completed substance abuse counseling and had negative drug tests from September 20, 2022, through January 19, 2023. Counsel represented that Mother recognized she could not ever have her children around criminal activity, she was prepared to comply with any court orders concerning supervised visitation with Father and staying away from the property the children were removed from, and she was prepared to do whatever was necessary to get her children back.

Father's counsel acknowledged he did not have the same progress as Mother and submitted on the recommendations relating to him.

The children's counsel requested the court follow the Department's recommendations and order family reunification services.

The Department's counsel acknowledged Mother was participating in her case plan, but was concerned "she ha[d] not taken any responsibility for putting her children at risk in the first place." Based on Mother's testimony at the jurisdiction hearing "essentially" denying responsibility, the Department did not believe the children could be safely returned.

The court asked, "[I]f Mother is completing child neglect, parenting and substance abuse and testing negative going forward, what is it we're asking her to do? Mental health counseling?" Department answered affirmatively and said that Mother had been assessed, but found not eligible for services. The Department sought a second assessment with reports from the case. Mother's counsel informed the court that Mother was asked to get one assessment, which she had done, and was being asked to get a second assessment.

The court denied Mother's request, concluding, "[W]e would never keep children away from parents to teach them a lesson. That would be so inappropriate and that will not happen in this court. By the same token, risk can be shown in a number of different ways, and one of those ways is a parent who does not take any responsibility for what happened. Because if a parent doesn't take responsibility for what happened, it can

9.

happen again." The court viewed Mother's testimony regarding the rural property from which the children removed as "very contrary" to the evidence before the court concerning the events on the day of the removal, and stated, "So if the mother can't be honest with this Court, then I question whether she can be honest with herself. And if she cannot be honest with this Court and herself, then she can't follow the orders going forward and that's my concern. [¶] Going forward, again, we need to figure out what the issue is so we can address that issue or it isn't appropriate to require her to do additional reunification services. And the only thing I can think is, she needs individual counseling to address … what happened in this case, what happened in terms of her recitation of the facts, which are different from the objective facts, as I see them, and how she is going to protect the children going forward. And with the benefit of the jurisdiction reports, I think that the mental health agency assessing her will be able to determine that she does qualify for services, she does need individual counseling, and will be able to provide her the proper counseling."

The court restated that the children were adjudged dependents of the court under section 300, subdivision (b). Pursuant to section 361, subdivision (c)(1), the court found by clear and convincing evidence that there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if they were returned home, and there were no reasonable means by which their physical health could be protected without removing them from Mother's and Father's physical custody. The court ordered reunification services for Mother and Father for six months and set a review hearing. Mother was ordered to comply with case plans for child neglect, substance abuse and mental health treatment, and to obtain a new mental health assessment.

Mother filed a timely notice of appeal.

# DISCUSSION

## I. Count B-2 Jurisdictional Allegation Unsupported by Substantial Evidence of Substance Abuse by Mother

### A. Background

The petitions filed in this case for Sky and for Desiree contained three counts under section 300, subdivision (b). Count b-1, which Mother does not challenge, provides:

> "The child … has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness by a willful or negligent failure of the mother, [D.S.], and the father Jonathan W[.], to provide the child with adequate shelter. On September 07, 2022, approximately three to four greenhouses used for marijuana grow were located on the family's property. One ounce of cocaine and nine pounds of marijuana were located in the [parents'] bedroom within reach of the children. Tubs of water with concentrated toxic pesticides were located on the property within reach of the children. The exposed solar panels cables located in the [parents'] bedroom within reach of the children pose a safety threat for the children."

Count b-2, at issue in this appeal, provides:

> "The child … has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness by the inability of the mother, [D.S.] to provide regular care to the child *due to the mother's substance abuse*. The mother is pregnant and was diagnosed with hyperemesis gravidarum. The mother consumes edibles to help with her morning sickness. The mother is consuming edibles while caring for the children. One ounce of cocaine and nine pounds of marijuana were located in the [parents'] bedroom within reach of the children. The mother was driving at an unsafe speed on a dirt road, in an attempt to flee from law enforcement, placing the children's life at risk." (Italics added.)

Count b-3, also unchallenged, pertains to Father's substance abuse consisting of daily marijuana use and his mental illness.

### B. Legal Principles

Under section 300, subdivision (b)(1), "a juvenile court may assume jurisdiction where the 'child has suffered, or there is a substantial risk that the child will suffer,

11.

serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. [¶] (B) The willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left. [¶] (C) The willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment. [¶] (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse.'" *(In re S.F.* (2023) 91 Cal.App.5th 696, 712 (*S.F.*), quoting § 300, subd. (b)(1)(A)–(D).)

"[T]o obtain a jurisdictional determination under section 300, subdivision (b)(1), an agency must 'prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness.' (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601 (*Cole L.*); *In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.) A court 'need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.' (*Cole L.*, at p. 602.) And a parent's '"[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue."' (*Ibid.*) However, '"[t]o establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.'"' (*Ibid.*; see *D.L.*, at p. 1146.)" *(S.F., supra*, 91 Cal.App.5th at pp. 712–713.)

"The Department has the burden of proving by a preponderance of the evidence that the children are dependents of the court under section 300." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light

12.

most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

### C. Analysis

"The law is clear that jurisdiction must be based on substance *abuse*; mere substance *use* is not sufficient for jurisdiction." (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046 (*J.A.*), citing *In re Drake M.* (2012) 211 Cal.App.4th 754, 764 (*Drake M.*), disapproved on another ground by *D.P., supra*, 14 Cal.5th at pp. 282–283; accord, *In re L.W.* (2019) 32 Cal.App.5th 840, 849; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003.) Mother points out there is a split of appellate authority over what constitutes substance abuse in this context.

In *Drake M.*, the court held that "a finding of substance abuse must be based on evidence sufficient to show that: (1) the parent had been diagnosed as … having a current substance abuse problem by a medical professional; or (2) the parent has a current substance abuse problem as defined by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000) (DSM-IV)." (*J.A., supra*, 47 Cal.App.5th at p. 1047, citing *Drake M., supra*, 211 Cal.App.4th at p. 766.) Subsequently, a different division of the same appellate court "recognize[d] the *Drake M.* formulation as a generally useful and workable definition of substance abuse for purposes of section 300, subdivision (b)," but concluded "it [was] not a comprehensive, exclusive definition mandated by either the Legislature or the Supreme Court" and declined "to accept [the] argument that only someone who has been diagnosed by a medical professional or who falls within one of the specific DSM-IV-TR categories can be found to be a current substance abuser." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1218 (*Christopher R.*); accord, *In re K.B.* (2021) 59 Cal.App.5th 593, 601.) *Christopher R.* also recognized that the definition in *Drake M.* was "replaced in the more recent Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), published in May 2013 after the decision in *Drake M.*, by a more broadly

13.

defined classification of 'substance use disorders ….'" (*Christopher R., supra*, at p. 1218, fn. 6.)

Mother notes that the issue is pending review before the California Supreme Court and urges us to follow *Drake M.* However, it is unnecessary for us to weigh in on the split over the definition of substance abuse because there is *no* evidence of substance abuse by Mother in this case. The only evidence of drug use by Mother, who was pregnant at the time of the initial removal, was her and Father's reports that she used marijuana to treat her severe morning sickness. She reported using only edibles while Father reported she used edibles and smoked "sometimes." Father also stated Mother was told to use marijuana for this purpose by a hospital doctor.

Mother, whose due date was February 2023, testified she stopped using marijuana shortly before the children were removed, and her four drug tests between September 2022 and January 2023 were negative.[6] The Department's supplemental reports dated October 22, 2022, and filed January 30, 2023, reflected, "[M]other has past history of drug use that interferes with the family's functioning." However, that history appears to be in reference to Mother's self-reported use of marijuana to quell her severe nausea at the time of Sky's and Desiree's removal. In addition, the reports document that during her telephone interview with a public health nurse in September 2022, Mother reported that she used edibles to treat hyperemesis gravidarum during her pregnancy with Sky, with her doctor's permission.

"[E]vidence supporting the jurisdictional finding must be considered '"in the light of the whole record"' 'to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value ….'" (*In re I.C.* (2018) 4 Cal.5th 869, 892, italics omitted; accord, *In re G.Z.* (2022) 85 Cal.App.5th 857, 876.) As

---

[6] The supplemental report for Desiree, filed on October 10, 2022, erroneously identified Mother as M.M., but the drug test results included with the report reflect Mother's identity and the error was corrected in the report submitted for Sky.

stated, "[w]hile evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the child to the defined risk of harm. Previous acts of neglect alone do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur." (*In re G.Z., supra*, at p. 877, citing *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565; accord, *In re L.B.* (2023) 88 Cal.App.5th 402, 416; *In re J.N.* (2021) 62 Cal.App.5th 767, 775.)

Here, the evidence of mere marijuana *use* by Mother to treat her morning sickness around the time of initial removal is patently insufficient to support an allegation of substance *abuse* by Mother. (*J.A., supra*, 47 Cal.App.5th at p. 1046; *In re L.C.* (2019) 38 Cal.App.5th 646, 652.) Nothing suggests Mother displayed any signs of being under the influence of marijuana or any other drug when the children were initially removed or connects her self-reported use of marijuana to the conditions at the property and house or her flight from the property. Mother reported that prior to the children's removal, she stopped using marijuana, which was supported by her negative drug tests from September 2022 through January 2023, and there is no evidence linking her past use of marijuana to treat morning sickness to a substantial risk of harm to the children.[7] (*S.F., supra*, 91 Cal.App.5th at pp. 717–718; *In re J.N., supra*, 62 Cal.App.5th at p. 775.) Notably, the Department does not defend this jurisdictional finding, choosing instead to respond exclusively on grounds of mootness.

---

[7] *Drake M.* recognized that some cases involve "'children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety'" (*Drake M., supra*, 211 Cal.App.4th at p. 767, quoting *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, overruled on another ground by *In re R.T., supra*, 3 Cal.5th at p. 629), and, therefore, "the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm" (*Drake M., supra*, at p. 767). (Accord, *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1385; *Christopher R., supra*, 225 Cal.App.4th at p. 1216.) At a minimum, one-year-old Desiree was of tender years, but, as stated, there is no evidence of substance abuse by Mother or inability to provide care for Sky and Desiree by Mother.

Given the absence of any evidence of substance abuse by Mother, we reverse the juvenile court's jurisdictional finding on count b-2.

## II.       Removal Order

Next, Mother challenges the juvenile court's order removing the children from her physical custody.  (§ 361, subd. (c)(1).)  The remaining jurisdictional finding against Mother relates to conditions at the rural property where the children were initially removed.  Mother and Father were still in a relationship together, but the evidence reflects they were living apart.  While Father continued to live at the property, Mother had moved in with a friend in California City and at the time of the jurisdiction and disposition hearing, she was living in her own two-bedroom apartment in California City.

### A.       Legal Principles

The relevant statute, section 361, subdivision (c)(1),  provides:

> "(c)     A dependent child shall not be taken from the physical custody of his or her parents, guardian or guardians, or Indian custodian with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in paragraphs (1) to (5), inclusive, and, where it is known or there is reason to know that the child is an Indian child, as defined by Section 224.1, paragraph (6):

> "(1)     There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's, guardian's, or Indian custodian's physical custody. The fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent, guardian, or Indian custodian with whom the minor resided at the time of injury.…"

"'"'The elevated burden of proof for removal from the home … reflects the Legislature's recognition of the rights of parents to the care, custody and management of their children, and further reflects an effort to keep children in their homes where it is

safe to do so.  [Citations.]  By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the "bias of the controlling statute is on family preservation, not removal.""""  (*S.F., supra*, 91 Cal.App.5th at p. 720, quoting *In re M.V.* (2022) 78 Cal.App.5th 944, 959 (*M.V.*).)

"Indeed, '"[a] dispositional order removing a child from a parent's custody is 'a critical firebreak in California's juvenile dependency system' [(*In re Paul E.* (1995) 39 Cal.App.4th 996, 1003)], after which a series of findings by a preponderance of the evidence may result in termination of parental rights." [Citation.]  Thus, California dependency laws "establish that out-of-home placement is not a proper means of hedging against the possibility of failed reunification efforts, or of securing parental cooperation with those efforts.  It is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent.  The law requires that a child remain in parental custody pending the resolution of dependency proceedings, despite the problems that led the court to take jurisdiction over the child, unless the court is clearly convinced that such a disposition would harm the child.  The high standard of proof by which this finding must be made is an essential aspect of the presumptive, constitutional right of parents to care for their children.""""  (*S.F., supra*, 91 Cal.App.5th at p. 721, quoting *M.V., supra*, 78 Cal.App.5th at p. 959.)

"We review a dispositional order removing a child from a parent for substantial evidence, '"keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence."'  (*In re I.R.* (2021) 61 Cal.App.5th 510, 520 (*I.R.*).)  '[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands.'  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.)  In applying this standard of review, 'the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have

found it highly probable that the fact was true.' (*Id.* at pp. 995–996.) We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*M.V., supra*, 78 Cal.App.5th at p. 960.)

### B. Analysis

In this case, Mother not only left the physical location and house found to present a substantial risk of serious physical harm or illness to the children in count b-1, but she was living apart from Father, against whom there was the count b-3 finding based on marijuana use and mental illness. At the time of the jurisdiction and disposition hearing, Mother had only one remaining parenting class left, her drug tests were negative, she was attending substance abuse counseling, and she was found ineligible for services following a mental health evaluation.

The record reflects that the Department's recommendation, and the court's disposition orders, were based on concern that Mother lacked insight into and had not taken responsibility for the living conditions that led to the initial removal of the children; and the court found her testimony concerning the rural property, her link to it, and the circumstances surrounding her residence there to be uncredible. Mother initially told a social worker that she owned the property, had lived there two years, and rented out the parcel with the marijuana grow, and that Father was usually there during the week but spent weekends at his mother's house. In contrast, at the jurisdiction hearing, Mother testified that she was living with a friend in California City at the time of the initial removal, and she was unaware of and not living at the rural property, which was identified in court by a specific street address. Mother did testify immediately thereafter that she lived *near* that property address and had part ownership in a parcel lot. Mother's friend, T.W., testified that Mother and the children moved in with her in July 2022, they

18.

were there every night, and they left the morning of the initial removal to have a breakfast date with Father, which the court also found to be uncredible.

We do not fault the court, the Department, or children's counsel for being concerned that Mother was being less than forthcoming in her testimony about her connection to the property and was minimizing, to some extent, responsibility concerning the initial living situation. However, none of the testimony brought into question the steps Mother took after the children were initially removed or her living situation at the time of the hearing. Instead, the record reflects Mother expressed determination to do whatever was necessary to secure the return of her children, and there was no evidence her living situation was other than as described at the hearing and argued by her counsel.

As previously summarized, the social worker argued that the law "is clear that you cannot fix something that you don't take responsibility for," and "after the mother's testimony, which essentially denied any responsibility, at this point, the Department does not believe the children could be returned to her and be safe." In adopting the recommendation to remove the children from Mother's physical custody, the court agreed, "[R]isk can be shown in a number of different ways, and one of those ways is a parent who does not take any responsibility for what happened. Because if a parent doesn't take responsibility for what happened, it can happen again. [¶] … [¶] … So if the mother can't be honest with this Court, then I question whether she can be honest with herself. And if she cannot be honest with this Court and herself, then she can't follow the orders going forward and that's my concern."

However, these concerns do not justify the removal of the children from Mother's physical custody. "Although troubling, [a parent's] 'lack of transparency' or subsequent denial of the events that led to dependency is not sufficient, by itself, to justify removal of the [c]hildren from [that] parent's custody." (*M.V., supra*, 78 Cal.App.5th at p. 962, citing *In re Henry V.* (2004) 119 Cal.App.4th 522, 525 (*Henry V.*).) It bears repeating "that out-of-home placement is not a proper means of hedging against the possibility of

19.

failed reunification efforts, or of securing parental cooperation with those efforts. It is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent. The law requires that a child remain in parental custody pending the resolution of dependency proceedings, despite the problems that led the court to take jurisdiction over the child, unless the court is clearly convinced that such a disposition would harm the child. The high standard of proof by which this finding must be made is an essential aspect of the presumptive, constitutional right of parents to care for their children." (*Henry V., supra*, at p. 525; accord, *M.V., supra*, at p. 959.) "In all too many cases, the risks involved in returning a child to parental custody at the dispositional phase are clearly established. When they are not, as in this case, the juvenile court must recognize the legal restraints against separating parent and child." (*Henry V., supra*, at p. 531.)

In sum, the removal order must rest on a finding, by clear and convincing evidence, of a substantial danger to the children if returned to Mother and no reasonable means by which to protect the children's physical health without removal. (§ 361, subd. (c)(1).) In this case, there is no evidence Mother was still living at the rural property, was otherwise returning to the property, or was living with Father, all of which would be relevant considerations in view of the counts b-1 and b-3 findings. To the contrary, the record reflects Mother remedied those conditions of concern by securing different housing and living separately from Father, and she did so without delay. Accordingly, we find that the juvenile court erred when it removed Sky and Desiree from Mother's physical custody under section 361, subdivision (c)(1), and we reverse the court's order of January 30, 2023, removing the children from Mother's physical custody pursuant to section 361, subdivision (c).

## III.    Case Plan Orders

Finally, Mother challenges the dispositional orders relating to substance abuse and mental health. As discussed next, we agree that in the absence of any evidence of substance abuse or mental health concerns pertaining to Mother, issuance of these dispositional orders was an abuse of discretion.

### A.    Legal Principles

"The dependency statutes authorize the juvenile court 'to make orders pertaining to abused or neglected children who come within the court's jurisdiction.'" (*In re E.E.* (2020) 49 Cal.App.5th 195, 208, quoting *In re Ashley M.* (2003) 114 Cal.App.4th 1, 7 [citing §§ 361, 362].) As set forth by this court in *In re M.R.*, "'[t]he … central unifying tool in child welfare services' is called the 'case plan.' (§ 16501.1, subd. (a)(1).) It is a plan written by the Agency to ensure 'that services are provided to the child and parents or other caretakers … in order to improve conditions in the parent's home, to facilitate the safe return of the child to a safe home or the permanent placement of the child, and to address the needs of the child while in foster care.' (§ 16501.1, subds. (a)(2) [goals] & (e) [written].)

"The case plan has several components, including:  identifying the reasons for dependency (§ 16501.1, subd. (g)(3)); setting forth specific goals and describing why planned services are appropriate to meet those goals (§ 16501.1, subd. (g)(2)); and describing the services to be provided to assist in reunification (§ 16501.1, subd. (g)(10)).

"The case plan is generally written within 60 days of removing the child and must be updated as the service needs of the family dictate. (§ 16501.1, subd. (e).) The case plan must be updated with each status review hearing. (*Ibid.*) Between review hearings, the casework supervisor may modify the case plan in furtherance of its goals without court approval. (§ 16501.1, subd. (g)(14).)

"One reason the case plan is so important is that, in cases where the child was under three years old when removed, parents must be advised that failure 'to cooperate or

avail himself or herself of services provided as part of the child welfare services case plan may result in a termination of efforts to reunify the family after six months.' (§ 361.5, subd. (a)(3)(C).)

"The Agency submits the case plan to the court ahead of the dispositional hearing. (See § 358, subd. (b)(1).) The court must 'consider[]' the case plan 'at the initial hearing and each review hearing.' (§ 16501.1, subd. (g)(14); see also § 358, subd. (b)(1); Cal. Rules of Court, rules 4 5.708(b)(3), 5.706(b)(2).) The court reviews the plan to determine whether it satisfies the requirements of section 16501.1 (Rule[] 5.690(c)(2)(A)–(B)) and to verify that appropriate parties were consulted in its preparation (Rules 5.690(c)(2)(C)–(D), 5.708(e)(3)–(10)).

"When the court orders a parent to participate in a program—such as parent education, counseling, parenting programs, etc.—the program must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' (§ 362, subd. (d).) In other words, the court cannot arbitrarily order services that are 'not reasonably designed' to eliminate the behavior or circumstances that led to the court taking jurisdiction of the child." (*In re M.R.* (2020) 48 Cal.App.5th 412, 423–424, fns. omitted, citing *Drake M., supra*, 211 Cal.App.4th at pp. 770–771.)

"We review the juvenile court's disposition case plan for an abuse of discretion. 'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1071.) "'A "mechanical approach" to a reunification plan is not what the Legislature intended: "[s]uch a plan must be appropriate for each family and be based on the unique facts relating to that family."'" (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.)" (*In re M.C.* (2023) 88 Cal.App.5th 137, 155 (*M.C.*).)

## B. Analysis

As previously discussed, there is no evidence Mother's consumption of marijuana to combat morning sickness constituted substance abuse or that her use of marijuana for this purpose was linked to a substantial risk of serious harm to the children. Mother stated she had stopped using marijuana around the time the children were taken into temporary custody in September 2022 and her drug tests were all negative. The only other indication of drug use in the record was her report of using marijuana to combat morning sickness when she was pregnant with Sky. This falls well short of demonstrating a substance abuse problem supporting drug or alcohol testing, or substance abuse treatment or counseling. (*S.F., supra*, 91 Cal.App.5th at p. 726; *M.C., supra*, 88 Cal.App.5th at pp. 155–156.)[8]

Similarly, there is no evidence in the record that Mother suffers from any mental health issues. Neither she nor Father reported she had any issues, and the record reflects she underwent a mental health evaluation as directed and was found ineligible for services. The Department's dispositional reports for Sky and Desiree recommend "the mother participate in mental health counseling to address mental health symptoms including anxiety and poor coping skills," but the basis for this recommendation is entirely unclear. To the extent the recommendation is based on more than standard boilerplate language in dependency cases, it is not grounded in any specific evidence, so far as we can discern from the record.

As previously discussed, the record indicates that the Department's recommendation, and the court's subsequent order, for a second mental health evaluation was based on concern that Mother had not taken responsibility for the living conditions that led to the initial removal of the children and Mother's testimony concerning the rural

---

[8] The record indicates Mother enrolled in substance abuse counseling prior to the jurisdiction and disposition hearings, and her counsel represented she had completed the requirement and was awaiting the certificate.

property, her link to it, and the circumstances surrounding her residence there was inconsistent with her statements to law enforcement and social workers at the commencement of these proceedings. However, that testimony did not relate to substance abuse by Mother or any mental health issues.

We have reversed the count b-2 jurisdiction allegation against Mother based on substance abuse, and a nexus must exist "between the remaining valid conditions leading to the dependency and the challenged disposition orders." (*S.F., supra*, 91 Cal.App.5th at p. 726.) Absent evidence that Mother had substance abuse or mental health issues, it was an abuse of discretion to order Mother to submit to drug and alcohol testing, participate in substance abuse counseling or treatment, obtain a second mental health evaluation, and participate in mental health counseling or treatment. (E.g., *ibid.*; *M.C., supra*, 88 Cal.App.5th at pp. 155–156; *Drake M., supra*, 211 Cal.App.4th at p. 770; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 172–173.) Accordingly, as to Mother, we reverse the aforementioned dispositional orders entered on January 30, 2023.

## DISPOSITION

We reverse the following jurisdictional and dispositional orders entered by the juvenile court on January 23, 2023, and January 30, 2023: the count b-2 jurisdictional finding against Mother under section 300, subdivision (b); the order removing the children from Mother's physical custody under section 361, subdivision (c); and the orders to submit to drug and alcohol testing, participate in substance abuse counseling or

treatment, obtain a second mental health evaluation, and participate in mental health counseling or treatment.  The judgment is otherwise affirmed.


MEEHAN, J.

WE CONCUR:


DETJEN, Acting P. J.


PEÑA, J.